**UNITED STATES of America ex rel. Major HARDEN, a/k/a "Major X Brown", Petitioner,**

v.

**H. W. FOLLETTE, Warden of Green Haven Prison, Stormville, New York, Respondent.**

No. 67 Civ. 4491.

United States District Court, S. D. New York.

Aug. 10, 1970.

Basil Apostle, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen., State of New York, by Joel H. Sachs, Asst. Atty. Gen., New York City, for respondent.

## OPINION

MOTLEY, District Judge.

This proceeding is before the court on a petition for a writ of habeas corpus involving three convictions of petitioner by the courts of New York.

Initially, petitioner filed a habeas corpus petition attacking only his conviction of May 11, 1966, which this court denied on March 29, 1968 on the ground that since petitioner was not challenging the validity of a prior conviction and sentence of March 26, 1965 which he was then and is presently serving, habeas corpus would not lie, citing McNally v. Hill, 293 U.S. 131, 55 S.Ct. 24, 79 L.Ed. 238 (1934) and United States ex rel. Burke v. Fay, 231 F.Supp. 385 (S.D.N.Y. 1964).

Petitioner thereupon filed a pro se motion in the Court of Appeals for a certificate of probable cause which was granted on January 20, 1969 and the case remanded for a hearing. After this court's ruling of March 29, 1968, the Supreme Court on May 28, 1968 in Peyton v. Rowe, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968) expressly overruled McNally v. Hill, *supra*, and held that a prisoner serving consecutive sentences is "in custody" under any one of them for the purposes of the federal habeas corpus statute 28 U.S.C. § 2241 (c) (3). After the case was remanded, this court appointed counsel for petitioner. Petitioner, however, now also challenges the validity of his 1965 conviction and his 1958 conviction, which he has already served.

On January 8, 1958, petitioner was convicted and sentenced to an indeterminate term with a five year maximum after pleading guilty to forgery in the second degree. He served three years.

A jury found petitioner guilty of robbery in the first degree and rape in the first degree (which occurred on July 17, 1964) in February 1965. Petitioner was sentenced on March 26, 1965 to 15 to 40 years as a multiple felony offender on the robbery count and an indeterminate sentence of one day to life on the rape

count. On April 11, 1969, petitioner was given a new psychiatric examination and a hearing pursuant to Specht v. Patterson, 386 U.S. 605, 87 S.Ct. 1209, 18 L. Ed.2d 326 (1967). The court resentenced him to one day to life on that day. Petitioner is presently appealing that sentence in the state court and withdrew the *Specht* hearing and sentence question in the instant petition for habeas corpus.

On May 11, 1966, after petitioner had begun serving his sentences on his 1965 convictions, a jury found him guilty of two counts of robbery in the first degree, two counts of grand larceny in the second degree, two counts of assault in the first degree, and one count of possession of dangerous weapons, instruments and appliances. For these offenses, which occurred on August 17, 1964, plaintiff was sentenced as a multiple felony offender to 25 to 60 years on the robbery counts. The court suspended sentence as to each of the other counts. The court expressly made the sentences on the robbery counts concurrent with each other but consecutive to any other sentence on any other indictment.

## I. *The 1958 Conviction*

Petitioner has already served his sentence under the 1958 conviction. He challenges that conviction because it was used as the basis for his sentencing as a multiple felony offender at the 1965 sentence and conviction. Petitioner makes three claims: 1) ineffective assistance of counsel; 2) unconstitutional guilty plea; 3) failure to be given notice of right to appeal. Petitioner has commenced two separate and distinct post conviction proceedings arising out of his 1958 conviction. In November 1966, petitioner submitted his first application for a writ of coram nobis to the Suffolk County Court on the grounds that he was denied effective assistance of counsel at his arraignment, that he had ineffective counsel retained for him by his family, that a "deal" was made as to sentence, and that his confession was involuntary.

On January 5, 1967, the Suffolk County Court denied his coram nobis petition. The Appellate Division, Second Department, affirmed on June 5, 1967. 28 A.D. 2d 827, 282 N.Y.S.2d 457. On September 28, 1967, leave to appeal was denied.

Petitioner thereafter commenced a second coram nobis petition urging that the sentence imposed upon him in January, 1958 be vacated and that he be resentenced nunc pro tunc so that he might file a notice of appeal. On October 6, 1969, his second petition was denied. The appeal is pending before the Appellate Division, Second Department.

Respondent argues that petitioner has not exhausted his state remedies because petitioner's second coram nobis petition which raises a new issue (notice of right to appeal) is currently pending before the appellate courts and because new evidentiary facts are presented for the first time in petitioner's federal habeas corpus petition.

■ Respondent's claim that petitioner has failed to exhaust his state remedies is without merit. Petitioner has pressed his claims here of lack of effective assistance of counsel and his involuntary confession in every state tribunal and has alleged no new facts; instead, petitioner asks to call two additional witnesses at a requested evidentiary hearing to corroborate the facts set out in his affidavit.

■ Petitioner's principal ground for his claim of ineffective assistance of counsel is that retained counsel did not contact petitioner or his relatives until a few minutes before the trial. Trial counsel's brief consultation with petitioner does not, in itself, mean that petitioner was denied effective assistance of counsel. Petitioner is not unconstitutionally denied effective assistance of counsel unless "the proceedings which followed were, as a result, 'a farce and a mockery of justice.'" United States v. Tribote, 297 F.2d 598, 601 (2d Cir. 1961); *see* Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). The transcript of the guilty

plea shows that the resultant proceedings were not "a mockery of justice." Counsel succeeded in obtaining the district attorney's acquiesence to petitioner's guilty plea to only one count of a 21 count forgery indictment in the face of signed statements confessing to eight different incidents in which he forged a check.

■ Petitioner's allegation, without anything more, that his illegally obtained confession induced his plea of guilty cannot be an independent ground for attacking the guilty plea. McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Instead, it is another aspect of ineffective assistance of counsel. *Id.* 397 U.S. at 771, 90 S.Ct. at 1449, 25 L.Ed.2d at 773. Was counsel's advice to plead guilty in light of petitioner's present allegations that his confession was coerced "within the range of competence demanded of attorneys in criminal cases"? *Id.*

■■ Petitioner does not state that he had informed counsel that the confession was coerced; his allegation of a coerced confession was made for the first time in his 1967 coram nobis petition, some 10 years after his guilty plea. Such a long delay in presenting his claim casts doubt on its credibility. *See* United States ex rel. McGrath v. La Vallee, 348 F.2d 373 (2d Cir. 1965). Moreover, his present habeas corpus petition does not state any circumstances that would indicate that it was a coerced confession under the pre-*Miranda* standards. Therefore, counsel, even with

these allegations before him, would not have been giving ineffective assistance if he recommended that petitioner plead guilty to the one count. *See* United States ex rel. Boucher v. Reincke, 341 F.2d 977 (2d Cir. 1965).[1]

The petition for a writ of habeas corpus with respect to the 1958 forgery conviction is denied.

## II. *The 1965 Conviction*

There is no dispute that petitioner has exhausted his state remedies on his claims concerning his 1965 conviction for first degree robbery and first degree rape.[2] Petitioner claims that his 1965 conviction was unconstitutional because: 1) the confession admitted into evidence against him, and 2) the in-court and out-of-court identification evidence admitted into evidence against him, should have been excluded.

### *The Confession*

As to his confession, petitioner makes alternative claims. First, he says the signature thereon was not his. Secondly, he says, if it is his signature, he was coerced into signing the confession.

This court found that the Huntley hearing afforded petitioner by the state court was inadequate in respect to petitioner's contention that he did not sign the confession because the state court refused to appoint a handwriting expert to aid it in making this determination. This court thereupon appointed a handwriting expert, Mr. Ordway Hilton, to aid it in deciding whether the confession

---

1. All other claims raised against petitioner's 1958 conviction are without merit.

2. Although neither party has raised the question here, it appears that petitioner failed to object to the identification testimony at the trial. This raises the question of whether the petitioner had "waived" his improper identification procedures claim by his counsel's failure to object. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). When petitioner attacked the identification procedure upon review, the state did not raise the procedural ground that petitioner

failed to object to the admission of the identification testimony at the trial and argued the merits of this claim. Brief for Respondent (App.Div.2d Dept. 1966), at 5–6. In this light, the Appellate Division's affirmance without opinion can only be viewed as a rejection of petitioner's claim on the merits. Since this procedural defect in petitioner's claims did not result in the forfeiture of petitioner's state court remedies, there can be no waiver. Warden v. Hayden, 387 U.S. 294, 297, n. 3, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Developments, Federal Habeas Corpus, 83 Harv.L.Rev. 1038, 1106 n. 69 (1970).

was signed by petitioner. It also ordered an evidentiary hearing which was held on December 19, 1969.

In preparation for the December 19 hearing, Mr. Ordway Hilton studied the signatures on the two confessions that petitioner denied signing (one relating to the 1965 conviction and one relating to the 1966 conviction) [3] and compared them with the acknowledged signatures of petitioner. In Mr. Hilton's December 17 report, after concluding that the denied signatures were the petitioner's, he added that:

> It is my opinion that the signatures on the confessions are written in a much poorer less vigorous, and less well developed handwriting than any of the other signatures.

Ct. Exh. 1, at 2.

Mr. Hilton analyzed the possible reasons for this marked deterioration in petitioner's handwriting:

> * * * the three denied signatures * * * have the qualities of writing of a person who might be attempting to change his own signature or was seriously ill. From this examination and study I am unable to establish definite evidence that would distinguish between these two possible explanations for the August 23, 1964 signatures.

Ct. Exh. 1, at 3.

Mr. Hilton, after weighing these two possible explanations, concluded by saying that the "signatures in question are more like partially disguised writing. * * *" *Id.* at 4.

■ At the December 19 hearing, Mr. Hilton testified about the acknowledged and denied signatures of petitioner,

which were then admitted into evidence. After reading Mr. Hilton's report, hearing his expert testimony, and comparing the denied signatures with those signatures acknowledged to be petitioner's, no basis can be found for challenging Mr. Hilton's conclusion that the signatures on the confessions are petitioner's. Therefore, the court finds that petitioner *did* sign the confession in question.

■ Alternatively, petitioner claims that the Huntley hearing was also inadequate in respect to the question of whether he had made a voluntary confession.[4] He argues that it was inadequate because the failure to appoint a handwriting expert prevented him from corroborating his version of the facts, which was that he was severely beaten at the precinct headquarters.

Petitioner reasons that evidence of the marked deterioration of his handwriting was probative on the issue of whether he had been coerced into confessing because it revealed that he was in poor physical health at the time he was confessing.

In order to evaluate whether this new evidence makes the state court's hearing on the question of voluntariness of the confession inadequate, it is necessary to review the record of the state court hearing. Such a review of the record of petitioner's Huntley hearing before Judge McIrney on February 2, 1965, on the suppression of his confession, shows that the findings of fact turned on the credibility of the witnesses.

The police officers testified that petitioner was hit at the time of his arrest at around 11 P.M. on August 22, 1964, but that he was not seriously injured. They explained that petitioner was

---

3. Two confessions were signed on August 1, 1964. One related to the rape and robbery on July 16, 1964; that one was used for petitioner's 1965 conviction. The other one related to a robbery on August 17, 1964, and was used for his 1966 conviction. See the 1966 Conviction Section, *infra.*

4. Respondent argued that petitioner cannot deny on the one hand signing the confession and on the other hand argue that he was coerced into signing the confession in question. If, however, petitioner's allegations that the police beat him to semi-consciousness are true, then they are not inconsistent. Petitioner is only saying that he did not consciously sign the confession. If he actually physically signed it, he did it unconsciously and against his will.

struck in order to apprehend him since he was wielding a loaded shotgun at the time of his arrest. They further testified that no other acts of violence were committed against petitioner and that he was not coerced into confessing.

They testified that petitioner first made an oral statement, which was then reduced to writing by the police. Because petitioner had trouble reading this writing, the police read the statement to him. He signed the confession around 1:00 A.M. on August 23, 1964, which was about an hour after they started interrogating petitioner.

Petitioner testified that he refused to sign any statement; that, when he was brought to the precinct, he was handcuffed to a chair and beaten; and that he received facial bruises and a swelling in his groin from this beating. He further testified that his camera was in his car at the time of the arrest and that he was not carrying a gun at that time.

The state court found that no physical or psychological coercion was used upon petitioner, that the physical force was reasonable, and that petitioner was adequately informed of his constitutional rights prior to his making a confession.

In light of the detailed eyewitness testimony of the police officers and petitioner, does this new evidence of deteriorated handwriting make the Huntley hearing inadequate? To answer that question, it is necessary to review the handwriting expert's analysis of the possible causes of this handwriting deterioration.

At the December 19 hearing, Mr. Ordway Hilton was questioned about his December 17 handwriting report; he testified that this deterioration in his handwriting might have been caused by extreme nervousness or poor health or his attempt to write abnormally (Fed. T. 14).

On cross-examination by defense counsel, Mr. Hilton speculated that petitioner might have written his signature with the opposite hand with which he usually writes (Fed. T. 19). He further testi-fied that "it is a very slight possibility that [some physical disability] might have caused this deterioration." (Fed. T. 20.)

On cross-examination by the state, Mr. Hilton testified that it is conceivable that an arrest by the police for a serious crime could be the sort of nervousness which would cause this kind of deterioration in the handwriting (Fed. T. 21). Mr. Hilton also testified that there were several other factors which might have led to petitioner's handwriting deterioration: 1) petitioner had been thrown on the ground at the time of his arrest; 2) he had been a convicted forger; and 3) it was very late when the document was signed (Fed. T. 14).

Mr. Hilton's testimony, coupled with his December 17 report, is not probative evidence of a coerced confession. In fact, the testimony seems to be balanced towards petitioner's deliberate attempt at altering his handwriting. In view of petitioner's forgery conviction, the court finds that he has failed to meet his burden of showing new evidence as to the involuntariness of his confession. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770. The court, therefore, denies petitioner's motion for an evidentiary hearing on the question of the voluntariness of his confession.

*Identification Procedure*

█ Petitioner's second ground for granting a writ of habeas corpus as to his 1965 conviction is that it was constitutional error for the state court to allow the introduction of constitutionally defective precinct and in-court identification based upon that defective procedure. The precinct identification took place on August 23, 1964. Since United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), was held to be prospective in Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the pre-*Wade* due process standard on identification procedures for suspects applies:

[was] the confrontation * * * so unnecessarily suggestive and conducive

to irreparable mistaken identification that he was denied due process of law[?]

Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972 (1967); *accord* Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969).

The rape and robbery took place on July 16, 1964 at approximately 11:30 P.M. The white victims (who at the time were unmarried),[5] Mr. and Mrs. Joseph Martinolich, were in a parked car on an isolated road in Brentwood when a second car pulled up and parked near-by. Shortly thereafter, a Negro male came up to the automobile, put a shotgun up to the window, and announced that it was a stickup. (State T. 37, 100.) Mr. Martinolich was directed to give the assailant his wallet, which he did do, and was then locked in the trunk of his own auto. (State T. 38–39, 101.)

Mrs. Martinolich was then directed to go into the assailant's car and was ordered to undress or be killed. After undressing, she was photographed and then raped by the assailant. After the rape, her assailant took some more nude photographs and ordered her to get dressed. He then threw the keys to her car to her and left. (State T. 102–04.)

The precinct confrontation between the victims and the petitioner was conducted by the police on August 23, 1964 at 4:00 A.M., five weeks after the rape and robbery occurred. The police instructed the two white victims to look through a small window at a single Negro male sitting in the next room. (State T. 82–83.) The victims knew they were there to look at a new suspect. (State T. 81–82). After viewing petitioner, they said, "that was him." (State T. 217–18.)

The physical features of petitioner differ from the victim's description after the incident in that petitioner weighed 165 lbs. whereas the victim's statement said that the assailant weighed 190 lbs. (State T. 82.)

This same type of confrontation [hereinafter referred to as a showup] was used by the police in respect to an earlier suspected rapist, Willie Lott. (State T. 217–18.) On the day after the rape and robbery, July 17, 1964, both victims had been summoned to the precinct to see a suspect and had positively identified Mr. Lott, a 5' 9", 160 pound, Negro male as the assailant, even though Mr. Martinolich had earlier described the assailant in a statement to the police as being 6' 2" tall and weighing 190 lbs. (State T. 69–73.) Mr. Martinolich also signed a statement under oath that Mr. Lott was the assailant. Then on July 22, 1964, Mr. Martinolich made a positive in-court identification of Mr. Lott when he was sitting among three other Negroes. (State T. 75–76.) Later that day, Mr. Martinolich recanted his positive identification saying that other Negro males seated beside Mr. Lott looked more like the assailant than Mr. Lott did. (State T. 78–79.) In that same court proceeding, the rape victim, Mrs. Martinolich conceded that she "didn't see what [the assailant] * * * looked like." (State T. 117.) And at petitioner's trial, she admitted that she did not have a good look at the assailant. (State T. 113–114.)

Does this record disclose that the confrontation was "unnecessarily suggestive and conducive to irreparable mistaken identification"? *Stovall*, 388 U.S. at 302, 87 S.Ct. at 1972. The court thinks so.

The confrontation occurred when petitioner was not in a line-up but alone in a cell. In *Stovall*, the Court condemned this "practice of showing suspects singly to persons for the purpose of identification, and not as part of a lineup." *Id.* A showup can be saved only if "the totality of circumstances surrounding" the confrontation outweighed its prejudicial effect. In *Stovall*, the Court upheld the

---

5. Mrs. Martinolich's maiden name was Martha Celeste Lopez and is referred to in the state trial as Miss Lopez. She was 16 years old at the time of the rape; he was twenty years old. Subsequent to this incident but before petitioner's state trial, the two victims were married.

showup because it was only 15 minutes after the crime had been committed and the victim was on the brink of death. *Id.* The Second Circuit has, in interpreting *Stovall*, held that showups immediately after the crime do not violate due process. E. g. United States ex rel. Williams v. La Vallee, 415 F.2d 643 (2d Cir. 1969) (1 hour after robbery).

If the showup occurs after a significant amount of time has elapsed since the crime occurred, the Second Circuit must be convinced that the cellblock confrontation was justified by sources other than the cellblock confrontation. In United States ex rel. Rutherford v. Deegan, 406 F.2d 217 (2d Cir. 1969) (10 day time lapse), the Second Circuit was convinced that the victim had properly identified the assailant because the victim had given the police a detailed description of the assailant which matched the suspect's description, had failed to identify other suspects that were shown to her, testified that she had made a determined effort to study the assailant's features, and, in fact, was able to watch the two men closely during the robbery in a well lighted store. *Id.* at 219.

In this case, the showup did not take place immediately after the crime. Instead, the showup occurred five weeks after the crime. None of the factual surroundings of this showup gives the court the assurance that irreparable prejudice to the petitioner did not occur. Mr. Martinolich's description does not match petitioner's features in that petitioner was 165 lbs. and his description of the assailant was that he was 190 lbs. Secondly, the record reveals that the victims were inclined to view any Negro male whom they saw through the window in the cell door at the precinct as the assailant. The police were alerted to the highly suggestive effect of their identification procedure on these victims. For the victims had positively identified Mr. Lott as the assailant even though Mr. Lott's 5′ 9″ height and 160 lb. weight contrasted sharply with Mr. Martinolich's description of the assailant as being 6′ 2″ in height and 190 lbs. in

weight. The prejudicial effect of this precinct identification on any in-court identification was also evident because Mr. Martinolich picked Mr. Lott out from 3 or 4 other Negroes as the assailant even though he later explained that the other Negroes surrounding Mr. Lott looked more like the assailant than he did. Obviously, Mr. Martinolich was basing his identification on the highly prejudicial showups.

Finally, the crime occurred at night under highly emotional circumstances. Mrs. Martinolich conceded at the trial and at the Lott pre-trial hearing that she did not have a good look at the assailant. (State T. 112–113.) And there is no testimony that Mr. Martinolich had taken a long and hard look at the assailant.

Given this history, the police still chose to summon the two victims at 4:00 A.M. in the morning to view a new suspect. There was no emergency. No excuse was given for the police failure to put the suspect in a lineup and their failure to have each victim view the suspect separately. In view of the "totality of circumstances surrounding" the instant showup, the court holds that "the conduct of identification procedures [was] * * * 'so unnecessarily suggestive and conducive to irreparable mistaken identification' as to be a denial of due process of law." Foster v. California, 394 U.S. 440, 442, 89 S.Ct. 1127, 1128, 22 L.Ed.2d 402 (1969); *accord*, Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230, 1240–1241 (1968) (en banc), cert. denied, 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969), (cellblock showup).

■ Did this unlawful lineup so taint the in-court identification of Mr. and Mrs. Martinolich that their admission into evidence amounted to a denial of due process? In explicating the Supreme Court's holding in Foster v. California, *supra*, the Second Circuit has prescribed a method for answering that question:

The effort must be to determine whether, before the imprint arising from the unlawful identification pro-

cedure, there was already such a definite image in the witness' mind that he is able to rely on it at trial without much, if any, assistance from its successor.

United States ex rel. Phipps v. Follette, 428 F.2d 912 at 915 (2d Cir. 1970).

By such a test, Mrs. Martinolich's in-court identification must fail. Even though Mrs. Martinolich had ample opportunity to observe the assailant, she admitted at the Lott pre-trial hearing, at the grand jury hearings, and at the petitioner's trial that she didn't have a good image of the assailant (State T. 113–14, 117). Obviously, the precinct identification provided much assistance to her in-court identification. *See* Clemons v. United States, *supra*, 408 F.2d at 1241–1242 (Mrs. Parker who had viewed defendant at an improper identification procedure was not allowed to make an in-court identification because of her admittedly poor image of the robber).

In respect to Mr. Martinolich's in-court identification the record does not show that the government has met its burden of showing that the in-court identification was independent of the prejudicial precinct confrontation. However, the government was never asked to meet this burden at this pre-*Stovall* trial. Consequently, this court will not hold the state to this burden if the outcome of this writ were to turn on Mr. Martinolich's in-court identification, then the court would hold an evidentiary hearing on the question of the independence of the in-court identification. Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed. 2d 770 (1963).[6]

In summary, this court holds that it was constitutional error for the state court to admit the pre-trial identification testimony of both government witnesses and to admit the in-court identification of Mrs. Martinolich. But before this court may grant petitioner's writ, it must determine that these constitutional er-

rors were more than just harmless errors. *Phipps, supra,* 428 F.2d at 917, n. 8.

The Second Circuit has left open the question of whether the stringent harmless error test of Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) and Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) or the less stringent test of Kotteakos v. United States, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), applies to the unconstitutional admission of identification testimony at pre-*Stovall* trials. *Phipps,* 428 F.2d at 916.

In his dissent in Clemons v. United States, *supra,* 408 F.2d at 1253, Judge Wright suggests that the less stringent test of *Kotteakos* be used. But such a course is necessary only if his *per se* exclusionary rule is adopted as to all identification testimony relating to any unduly suggestive pre-trial confrontation. This court, however, has followed the majority's approach in *Clemons,* which rejected the *per se* rule for pre-*Stovall* trials, and would uphold the use of identification testimony concerning an unduly suggestive confrontation if "the out-of-court identifications admitted into evidence * * * were justified by sources other than the cellblock confrontations and thus can be deemed to be reasonably reliable indicators of guilt." *Clemons,* at 1248.

Similarly, the Court in Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969) did not apply a *per se* exclusionary rule as to unduly suggestive pre-trial confrontations. Instead, it treated the in-court and out-of-court identification testimony the same and held that the unfair lineup procedures "so undermined the reliability of the eyewitness identification as to violate due process." *Foster,* at 443, 89 S.Ct. at 1129. Although, as pointed out by Black, J., in dissent, the Supreme Court gave little guidance to the state court below, the Supreme Court did make clear to the

---

6. See the discussion of harmless error, *infra*.

state court that it must follow the stringent harmless error standard of *Chapman.* *Id.* at 444, 89 S.Ct. 1127.

Therefore, this court will apply the *Chapman* requirement that:

> The beneficiary of a constitutional error * * * [must] prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.

386 U.S. at 24, 87 S.Ct. at 828.

■ As the Court did in *Chapman* and *Harrington,* this court has made its own reading of the record to determine whether the introduction of the identification testimony "was harmless beyond a reasonable doubt." *Chapman,* at 24, 87 S.Ct. at 828. For the purpose of this test, the court will assume that all the identification testimony was constitutionally defective, including Mr. Martinolich's in-court identification testimony. This court's reading of the record reveals that the other evidence of petitioner's guilt was so overwhelming that the introduction of the identification testimony was harmless beyond a reasonable doubt. Harrington v. California, *supra.*

The most probative evidence of petitioner's guilt was petitioner's confession, which was first orally made to police officers, then was reduced to writing by the police and finally signed by petitioner. Petitioner did not present any evidence to rebut his confession.

The circumstantial evidence consists of the circumstances of petitioner's arrest. He was arrested at night in the same area of the woods, in which the rape occurred, with a shotgun, lantern, and camera in his possession. These items were in the assailant's possession at the time of the rape and robbery. Finally, Mr. Martinolich testified that the shotgun found on petitioner at the time of his arrest was the same shotgun that was pointed at him by the assailant.

This court believes beyond a reasonable doubt that no reasonable juror would be in doubt as to petitioner's guilt when presented with this evidence. United States ex rel. Dukes v. Wallack, 414 F.2d

246 (2d Cir. 1969) (defendant's confession was overwhelming proof of guilt). Since the granting or denying of petitioner's writ of habeas corpus does not turn on the question of taint as to Mr. Martinolich's in-court identification, this court will not give petitioner an evidentiary hearing on that question.

Petitioner's requested writ is denied as to his 1965 conviction.

### III. *The 1966 Conviction*

Petitioner attacks his 1966 conviction on three principal grounds: 1) denial of a right to a speedy trial; 2) unconstitutional admission of a coerced confession; 3) violation of his Fifth Amendment rights because of the prosecutor's comments. There is no dispute that petitioner has exhausted his state remedies on these three claims.

Petitioner was arrested on August 23, 1964 and was charged with several offenses which later formed the basis of two separate indictments. One indictment, handed down on October 21, 1964, upon which petitioner was tried on February 2, 1965 resulted in his March 1965 conviction discussed above. The second indictment of October 9, 1964 involved charges of first degree robbery, grand larceny in the 2d degree, felonious assault in the 1st degree, and possession of dangerous weapons. These offenses occurred on August 17, 1964. In January and February, 1965 petitioner made requests for a speedy trial on these charges and on June 4, 1965, he gave notice to the District Attorney demanding a speedy trial pursuant to N.Y.Code of Crim.P. § 669–a. On October 8, 1965, the case was put on the calendar for all purposes.

On October 13, 1965, petitioner was assigned counsel who moved to suppress evidence on November 1, 1965. The motion was argued before Judge Stark on December 17, 1965. Decision was reserved. On January 14, 1966, two motions to suppress evidence were argued before Judge McIrney. Decision was again reserved.

On February 14, 1966, the motion addressed to Judge Stark was decided by

him. On February 28, 1966, the motions before Judge McIrney were decided, and a hearing was held on March 23, 1966 by Judge McIrney to clarify the state of this case.

On April 12, 1966, a motion to dismiss for lack of a speedy trial was made. That motion was denied on April 20, 1966. On April 19, 1966, the trial began. Petitioner was found guilty on April 21, 1966 and sentenced on May 11, 1966.

Petitioner claims that the delay between his arrest on August 23, 1964 and his trial which began on April 19, 1966, amounted to a denial of a right to a speedy trial that assumed due process proportions.

The Second Circuit had laid down a four factor test for determining "whether denial of a speedy trial assumes due process proportions." United States ex rel. Von Cseh v. Fay, 313 F.2d 620, 623 (2d Cir. 1963). They are:

the length of delay, the reason for the delay, the prejudice to defendant, and waiver by the defendant. \* \* \*

█ For an incarcerated defendant the delay in this case from the time of arrest until his trial was lengthy—20 months. If petitioner had not been convicted of another offense—the rape and robbery offense—during this period, the court would agree with petitioner that he was denied a right to a speedy trial because "even a short delay might constitute a violation of the defendant's constitutional right where the defendant is held without bail, and there is no reason for the delay." *Id.* But petitioner was incarcerated only for the first six months of his 20 month incarceration in lieu of pre-trial bail. After March 26, 1965, petitioner was incarcerated in lieu of post-conviction bail because he was convicted of rape and robbery and given lengthy sentences for each charge. Thus this trial's delay was not the cause of any "undue and oppressive incarceration prior to trial." United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed. 2d 627 (1966).

The second factor to analyze is the reason for the delay. There is no evidence that the government delayed this case to gain any advantage over the petitioner. See Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 1573, 26 L.Ed.2d 26 (1970) (Brennan, J., concurring). The source of the first five months of the delay was the intervening indictment and trial of petitioner on the rape and robbery offense. The government was occupied in the active prosecution of that case. The source of the delay from November 1, 1965, until March 21, 1966, was petitioner's. Defense counsel's pre-trial motions to suppress evidence were pending during that period. The sources of the remaining 10 months of delay were governmental inaction and court congestion. Such unexcused delay cannot be condoned where defendant is without counsel for over a year as in this case, is incarcerated, and had made a formal demand for a speedy trial soon after his incarceration. If petitioner had suffered any prejudice at his trial as a result of this governmental inaction, this court would hold that his right to a speedy trial had been violated; however, no actual showing of prejudice has been made. Therefore, the court holds that the delay in bringing this matter to trial does not assume due process proportions.

Petitioner's second claim is that petitioner's coerced confession was unconstitutionally admitted at his state trial. The confession in question is one of two confessions that he signed on August 23, 1964. The rape and robbery confession was introduced at his 1965 trial. The court has already held, *supra*, that there was no basis for overturning the state court's determination that the confession was voluntary. The court sees no reason for a different result for the robbery confession which was admitted at his 1966 trial.

█ In respect to petitioner's claim that the prosecutor during his summation had violated his Fifth Amendment right to remain silent by unfairly commenting on his failure to take the stand, the court holds that such a claim is with-

out merit. The trial record indicates that the prosecutor did not make any direct reference to petitioner's failure to testify; instead, he commented that the government's evidence inculpating the petitioner stood uncontradicted. Such an indirect reference to petitioner's failure to take the stand, if it is such a reference at all, is considered proper prosecutorial advocacy in this Circuit. United States ex rel. Leak v. Follette, 418 F.2d 1266 (2d Cir. 1969).

All other claims raised against the 1966 conviction are without merit. The requested writ of habeas corpus as to petitioner's 1966 conviction is denied.