William Avon **TATE**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 5178.

District of Columbia Court of Appeals.

Argued May 26, 1970.

Decided Sept. 10, 1970.

Stuart S. Greenfeig, Washington, D. C., appointed by this court, for appellant.

Kenneth Michael Robinson, Asst. U. S. Atty., with whom Thomas A. Flannery, U. S. Atty., John A. Terry and Brian W. Shaughnessy, Asst. U. S. Attys., were on the brief, for appellee.

Before HOOD, Chief Judge, and KELLY and FICKLING, Associate Judges.

KELLY, Associate Judge:

In this appeal from a jury conviction of assault and attempted petit larceny appellant contends that the trial court erred in admitting certain testimony purporting to identify him as the assailant of Barry Fox, a thirteen-year old newspaper delivery boy. We reject appellant's argument that an out-of-court photographic identification was suggestive to the extent that it created a very substantial likelihood of an irreparable misidentification and hold that an in-court identification of appellant and testimony concerning the extrajudicial photographic identification were properly admitted in evidence. A somewhat extensive review of the testimony is required to explain our holding.

At trial the complainant testified that at 9:00 p. m. on April 19, 1969, while collecting from his newspaper route, he was set upon by a boy wearing dark pants, a light shirt, black and white tennis shoes, and a tan jacket with a zipper and side pockets. After identifying appellant as his assailant, he testified that as he was waiting a response to his knock on a window of an apartment located in a locked apartment building appellant approached him from behind and called to him; that he turned around and appellant pushed him into some bushes; and that after an unsuccessful attempt to extract the collection money from complainant's pocket, appellant kicked him in the face. Complainant testified that although it was dark out the incident occurred in the space of about four minutes, in the vicinity of illuminated street lamps, and that he had an opportunity to observe his attacker's face. On direct examination complainant described

how he subsequently identified a photograph of appellant from a police book of photographs. On cross-examination he stated that during the photograph identification, which occurred approximately a week after the attack, he was seated beside his nine-year old brother, Napoleon,[1] who witnessed the attack, and that he was about to select appellant's photograph when Napoleon pointed to it first.

After making a courtroom identification of appellant, Napoleon substantially corroborated his brother's testimony, stating that the street lamps were illuminated and that light was coming from the apartment window. He testified that when he saw his brother under attack he looked around to see if he could pick up something to use as a weapon to ward off the assailant. As for the photographic identification, he testified on direct examination that by looking over Barry's shoulder both he and his brother were able to view the photographs together and that they identified appellant's photograph at about the same time. On cross-examination, Napoleon stated that he and his brother were both holding the book of photographs and that Barry pointed to appellant's photograph first. On redirect he stated: "I was looking at another picture, and then, he saw the picture, and I came down the row and I saw it." He also testified that he witnessed the attack from a distance of eight or nine feet and that the assailant, who fled immediately after kicking complainant, wore black and white tennis shoes, dark pants, and a white "Peters" jacket.[2]

Testifying in his own behalf, appellant stated that he had never seen the two prosecution witnesses prior to the pretrial hearing; that he had never owned a pair of black and white sneakers; that he did purchase a pair of sneakers (presumably white) after Easter of that year, and, al-

though he remembered Easter as falling on April 23 of that year, he could not remember his whereabouts on April 19.

Appellant's mother testified that appellant owned neither a windbreaker nor a "Peters" jacket and that he purchased a pair of white sneakers right after Easter—which she testified occurred on April 6 of that year.

The evidence presented at the pretrial hearing on appellant's unsuccessful motion to suppress the identification testimony contained several discrepancies. Barry testified that his parents were present while the brothers were viewing photographs, while Napoleon stated that only his mother was present, his father having stayed in a waiting room. Napoleon testified that he sat in a separate chair beside his brother while they viewed a book containing "a lot of pictures" and that although his brother pointed to appellant's photograph first, he, Napoleon, identified the photograph "[b]ecause I knew that was the one" and not because his brother had pointed to that photograph. When Napoleon was asked if he observed the attacker sitting in the courtroom, he was not sure that appellant was the one but said he looked like the same man. At the pretrial hearing Napoleon could not remember whether or not the assailant was wearing sneakers.

At the evidentiary hearing Barry testified: "I had the book [of photographs] in my hand, and I turned to one page and then I looked down and I seen the boy." He stated that the identification was made after viewing about four photographs, and, although both he and Napoleon were looking at the book of photographs at the same time, his brother pointed to appellant's photograph first. On cross-examination, when the prosecutor asked Barry whether he had an opportunity to see his assailant's face, the trial

1. At a pretrial hearing on a motion to suppress the identification testimony, Napoleon stated that he was nine years old; at trial, later the same day, he gave his age as ten years old.

2. Napoleon described a "Peters" jacket as a zippered jacket with side pockets and buttoned sleeves.

transcript reflects that he answered: "No". After making a courtroom identification of appellant, Barry stated that he recognized appellant's photograph "of my own" and not because his brother recognized it.

A police officer, who did not testify at trial, stated at the pretrial hearing that the boys' father and mother accompanied them to the police station on April 26; that the father remained in a waiting room; that the two witnesses were seated next to one another at a table, and it was his recollection that instead of viewing the book of photographs together, Barry searched the photographs, located that of appellant, and then the book was handed to Napoleon who, starting from the beginning of the book, made his own identification.

To determine whether or not the trial court erred in allowing the in-court identification and the testimony concerning the extrajudicial photographic identification, we look to the Supreme Court's opinion in Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). "[E]ach case must be considered on its own facts, and * * * convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." [3]

In *Simmons*: "The robbery took place in the afternoon in a well-lighted bank. The robbers wore no masks. Five bank employees had been able to see the robber later identified as Simmons for periods ranging up to five minutes. Those witnesses were shown the photographs only a day later, while their memories were still fresh. * * * Each witness was alone when he or she saw the photographs." [4]

While the older and more numerous *Simmons* witnesses made their observations under better conditions and their identifications while isolated, we note that the photographic material in *Simmons* was limited to "[a]t least six photographs * * * [which] consisted primarily of group photographs with [the two suspects] each appearing several times in the series" [5]— a situation which, in itself, is not without elements of suggestiveness. [6]

In any event, we cannot accept appellant's argument that the *Simmons* fact situation sets an inflexible minimum standard which, when juxtaposed with the instant fact situation, requires that this case be reversed. With the identification cases culminating in *Simmons*, "the Court has formulated a broad standard of review which focuses upon the distinctive facts of each case in their totality, and which relies very heavily upon the special capacity and experience of judges, trial and appellate, to discriminate between real and fancied dangers of the miscarriage of justice." Clemons v. United States, 133 U.S. App.D.C. 27, 34, 408 F.2d 1230, 1237 (1968), cert. denied, 394 U.S. 964, 90 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

While the procedure of allowing witnesses to make photograph identifications a week after their observations and in the presence of each other was certainly unwise, [7] in our judgment the *Simmons* test was met and in this case, whether the identification procedure was in fact suggestive, or whether the prosecution witnesses were credible in spite of the errors present in their testimony, was a proper question for the trier of fact.

The two prosecution witnesses were carefully cross-examined before the jury. "The danger that the use of the technique [of a pretrial identification by photograph] may result in convictions based on mis-

---

3. 390 U.S. at 384, 88 S.Ct. at 971.

4. *Id.* at 385, 88 S.Ct. at 971.

5. *Id.*

6. *Id.* at 386 n. 6, 88 S.Ct. at 972.

7. United States v. Wilson, U.S.App.D.C. (No. 23,283, decided May 20, 1970).

identification may be substantially lessened by a course of cross-examination at trial which exposes to the jury the method's potential for error." [8]

The trial transcript indicates that the possibility of a misidentification was a major concern of the trial judge; at the pretrial hearing both youngsters were carefully examined by the court as to the circumstances of their photographic identification. The jury was instructed: "The big question here is whether or not the defendant was the man who committed [the offenses]. That, I can't help you with. You heard his testimony, the testimony of the young man who was attacked, and of his brother, and you must decide whether or not their identification of the defendant as the man who perpetrated these things was—is the thing that overbalances in your mind and makes up your mind that this defendant was the one that committed the offense. This is the big thing, it seems to me, that you have to decide in this case."

The trial judge also reflected a proper concern for the competence of the two young witnesses. At the pretrial hearing and at trial, both youngsters were examined by the court to determine whether or not they were qualified witnesses. The jury received an appropriate child witness instruction.

Considering all of the above, we must also reject appellant's suggestion that the discrepancies in the youngsters' testimony were sufficient to require the trial court to exclude the evidence from the jury's consideration.

Although we note that prejudice from a suggestive identification may be intensified when it is used in the prosecution's direct case,[9] especially in those trials in which the prosecution's direct evidence is limited to eyewitness testimony, we are also aware that "juries in criminal cases, before being called upon to decide the awesome question of guilt or innocence, are entitled to know more of the circumstances which culminate in a courtroom identification—an event which, standing alone, often means very little to a conscientious and intelligent juror, who routinely expects the witnesses to identify the defendant in court and who may not attach great weight to such an identification in the absence of corroboration." [10]

Because we find that the identification procedure used here, while unnecessarily clumsy, was not "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification",[11] we need not search for an independent source for the courtroom identification.[12] Nevertheless, we note that this case was tried subsequent to the decision of the United States Court of Appeals for the District of Columbia in United States v. Clemons, *supra,* which suggested that trial courts render a ruling on the possibility of an independent source of identification even though no constitutional violation be found.[13]

Affirmed.

8. 390 U.S. at 384, 88 S.Ct. at 971.

9. Young v. United States, U.S.App.D.C. (No. 21,756, decided June 26, 1970).

10. Clemons v. United States, 133 U.S.App. D.C. 27, 40, 408 F.2d 1230, 1243 (1968), cert. denied, 394 U.S. 964, 90 S.Ct. 1318, 22 L.Ed.2d 567 (1969). *See also* United States v. Williams, 137 U.S.App.D.C. 231, 421 F.2d 1166 (1970).

11. 390 U.S. at 384, 88 S.Ct. at 971.

12. *See* United States v. Williams, *supra* n. 10, at 1167 n. 2; Bryson v. United States, 136 U.S.App.D.C. 113, 118, 419, F.2d 695, 700 (1969).

13. 133 U.S.App.D.C. at 34, 408 F.2d at 1237. *See also* United States v. Williams, *supra* n. 12.